1   YAR R. CHAIKOVSKY (SB# 175421)
    yarchaikovsky@paulhastings.com
2   ANDY LEGOLVAN (SB# 292520)
    andylegolvan@paulhastings.com
3   PAUL HASTINGS LLP
    1117 S. California Avenue
4   Palo Alto, California  94304-1106
    Telephone:  1(650) 320-1800
5   Facsimile:  1(650) 320-1900

6   Attorneys for Plaintiff
    CANON, INC.

7

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  CANON, INC.,                          Misc. Case No. 3:20-mc-80080-JCS
                                          Misc. Case No. 3:20-mc-80079-JCS
12              Plaintiff,
                                          PENDING IN THE UNITED STATES
13       vs.                              DISTRICT COURT FOR THE EASTERN
                                          DISTRICT OF TEXAS
14  TCL ELECTRONICS HOLDINGS, LTD., et
    al.,                                  E.D. Texas Civil Action No. 2:18-cv-0546
15
                Defendants.               **CANON, INC.'S REPLY IN SUPPORT
16                                        OF ITS MOTION TO TRANSFER
                                          ROKU INC.'S SUBPOENA-RELATED
17                                        MOTIONS TO THE ISSUING COURT**

18

19            **<span style="color:red">REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</span>**

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Canon seeks transfer of two Roku motions to quash. The issues raised in Roku's first, source code-related, motion are squarely the subject of a separate motion pending before the issuing court, creating the risk of inconsistent rulings between this Court and the issuing court. This potential for conflict weighs heavily in favor of transfer. The issues raised by Roku's second, financials-related, motion concern the merits of Canon's damages case. ██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████ Because the issuing court is already familiar with the TCL-Roku relationship underlying these discovery disputes, and resolution of these disputes could impact the merits and case schedule, Roku's motions should be resolved by the issuing court. And Roku will suffer no new burden from having its motions resolved by the issuing court as Roku is already responsible for and is directing the litigation defense in the underlying action.

## II.   ARGUMENT

### A.  The Risk of Inconsistent Rulings Warrants Transfer of Roku's Source Code Motion to the Issuing Court, Where the Same Issues Are Pending

Roku's source code motion is an attempt to seek two bites of the apple. Canon's motion to modify the protective order in the issuing court raises the questions of whether remote source code review is warranted in view of the COVID-19 health risks posed to Canon's experts and their family members or if in-person review is required in view the claimed undue burden and security risks raised by Roku. These are the same issues raised in Roku's motion here. Roku's counsel participated in all of the meet-and-confer and negotiation efforts leading up to Canon's motion in the issuing court—during which the parties discussed extensively the very same security concerns raised by Roku's motion in this Court. *See* Ex. E to Radsch Decl. (Dkt. No. 3) (email correspondence between counsel for Canon, Roku, and TCL regarding remote review of Roku's source code).[1] Those negotiations crystalized the issues briefed before the issuing court.

---

[1] Docket entries referenced in this brief are to case no. 20-mc-80079 unless specified otherwise.

1   Indeed, Canon did not brief the remote review in the abstract, but rather in the specific context of

2   production and review of Roku's source code.[2]

3          Nevertheless, Roku now argues that its security concerns are not before the issuing court.

4   Roku's Opp. at 5. This is incorrect. ██████████████████████████████

5   █████████████████████████████████████████████████████████████████

6   ████████████████.[3] Roku nonetheless filed its motion in this Court to make the same security

7   concern arguments.[4] Thus, Roku's claim that Canon's pending motion in the issuing court "does

8   not resolve, *or even address*, the issues presented here," Roku's Opp. at 5 (emphasis added), is

9   inaccurate. As a result, a ruling by the issuing court modifying the protective order to permit

10  remote review of Roku's source code and a ruling by this Court prohibiting remote review of

11  Roku's source code presents a clear potential for inconsistent rulings, which the Rule 45(f)

12  transfer mechanism was designed to prevent. *See Venus Med. Inc. v. Skin Cancer & Cosmetic*

13  *Dermatology Ctr. PC*, No. 15-00062MC, 2016 U.S. Dist. LEXIS 4754, at *8 (D. Ariz. Jan. 13,

14  2016) ("Because two motions involving substantially similar issues are pending before two

15  different courts, the danger of inconsistent rulings is present.").

16  _____

17  [2] *See* Canon's Mot. to Modify the Protective Order (Ex. A to LeGolvan Decl., Dkt. No. 7-1) at p.
    2–5 (describing issues relating to Roku's source code productions, including delays, deficient
18  productions, and difficulties conducting review in light of stay-at-home orders and health
    concerns); *id.* at p. 6–7 (addressing Roku's claimed security concerns raised by Roku on the
19  parties' meet and confer).

20  [3] *See* TCL's Opp. to Canon's Mot. To Modify the Protective Order to Permit Remote Review of
    Source Code (Ex. A to LeGolvan Decl., Dkt. No. 7-1) at p. 5 ("Roku produced its valuable source
21  code in reliance of the safeguards set out in the Protective Order, including the ability to control
    the review space. The Court should not loosen the protections relied upon by Roku in its
22  determination of how to proceed with source code production in this matter."); *id.* at p. 6 ("These
    opportunities for inadvertent or malicious copying of the producing party's source code present
23  significant burdens to the producing party.").

24  [4] *Compare* Dkt. No. 1 at 14 ("the computer hosting the source code review must be connected to
    the internet, which connection the reviewer or another actor could leverage to send the code over
25  the internet to another location"), *with* TCL's Opp. (Ex. A to LeGolvan Decl., Dkt. No. 7-1) at p.
    6 ("the host computer must be connected to a network, which the reviewer could exploit to send
26  the source code from the host computer to another location"); *compare* Dkt. No. 1 at 15 ("Roku
    has no way of knowing whether its source code is being copied or recorded by a device that is out
27  of the camera's view or otherwise not readily captured by a camera."), *with* TCL's Opp. at p. 6
    ("So long as the recording device is placed outside the wifi camera's view, the producing party
28  has no way of knowing whether its source code is being copied.").

Roku also makes two arguments that further bolster the appropriateness of transfer. First, Roku argues that the issuing court's COVID-19 Standing Order—which makes express findings of the hazardous nature of in-person source code review and encourages alternatives to avoid in-person review—does not apply to third parties. *See* Roku's Opp. at 6. Canon disagrees, as the Standing Order's reference to "parties" appears to be made in the colloquial sense and not necessarily to the exclusion of "third *parties*" involved in the court proceedings. Second, along the same lines, Roku argues that its production of source code is not governed by the issuing court's Protective Order. *Id*. at 6. Canon disagrees. Roku has acquiesced to the provisions of the Protective Order by (1) making prior document and source code productions pursuant to its terms and (2) holding Canon to the strict terms of the protective order during the review of Roku's source code.[5] Roku should not be permitted to use the Protective Order as both a sword and a shield, and subsequently disclaim its authority.

Regardless, whether—and to what extent—the issuing court's Standing Order and/or the Protective Order apply to Roku is an issue best resolved by the issuing court. *See Costco Wholesale Corp. v. Crane*, No. 16-mc-80189-JSC, 2016 U.S. Dist. LEXIS 132778, at *6–7 (N.D. Cal. Sep. 27, 2016) ("There can be no dispute that [issuing court], having issued the prior order, is in the best position to interpret the full scope and meaning of that order."); *E4 Strategic Sols., Inc. v. Pebble*, No. SA MC 15-00022-DOC (DFMx), 2015 U.S. Dist. LEXIS 191686, at *13 (C.D. Cal. Oct. 23, 2015) ("[The issuing court], and not this Court, is in the best position to interpret his prior orders and to determine the scope of non-party discovery in the Underlying Action.").[6]

**B. The Issuing Court Has Received Extensive Briefing on the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉**

---

[5] Ex. D to LeGolvan Decl. (email from Roku: "Roku produced its source code in full compliance with the Protective Order. . . ."); Ex. E to LeGolvan Decl. (email from Roku: "Paul Hastings also sent another individual to inspect the source code today, who I understand is a Paul Hastings employee, but who you did not identify in your notice of inspection, in violation of section 10(a) of the Protective Order").

[6] *See also Williams v. Big Picture Loans LLC*, No. 17-mc-80166-SVK, 2018 U.S. Dist. LEXIS 18779, at *5–6 (N.D. Cal. Feb. 5, 2018) (same); *Amtrust N. Am., Inc. v. Safebuilt Ins. Servs.*, No. MC 16-1-BLG-CSO, 2016 U.S. Dist. LEXIS 49160, at *13 (D. Mont. Apr. 12, 2016) (same); *OrthoAccel Techs. Inc. v. Propel Orthodontics LLC*, No. MC-16-00071-PHX-JJT, 2016 U.S. Dist. LEXIS 144819, at *4 (D. Ariz. Oct. 19, 2016) (same).

1    Similar considerations warrant transfer of Roku's motion regarding its ███████

2    ████████████████████████████████████████████████████████████████████

3    ███████████████████████████████████████ and the supplier of the

4    infringing operating system. Under such circumstances, patent case law recognizes that Roku

5    would play a key role in the hypothetical negotiation given Roku's interest in having TCL enter

6    into a license for Canon's patented technologies. Second, ████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████

10   ██████████████████████ Thus, █████████████████████████ is plainly

11   relevant under *Georgia-Pacific* factors, for example, relating to the "established profitability of

12   the product" or "its commercial success."

13       As explained in Canon's motion to transfer, the issuing court has already received

14   extensive briefing and argument regarding the ████████████████████. *See* Canon's

15   Mot. at 6–7. The issuing court even ordered supplemental *Markman* briefing (in view of positions

16   Roku took in related IPR proceedings) once Canon learned that the ████████████████████

17   █████████████████.[7] Roku attempts to split hairs by arguing that the ███████

18   ████████████████, on the one hand, and their ███████████████

19   █████████████, on the other hand, are distinct and unrelated subjects. Roku's Opp. at 7–8.

20   They are not. These issues are interrelated and provide factual predicate for considering ███████

21   ████████████████████████████████████████████████████.

22       Canon is seeking damages against TCL in the form of a reasonable royalty, which is based

23   on a "hypothetical negotiation" premised and analyzed under the factors articulated in *Georgia-*

---

24   [7] ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████████

1   *Pacific* case. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868-69 (Fed. Cir. 2010) ("A

2   'reasonable royalty' derives from a hypothetical negotiation between the patentee and the

3   infringer when the infringement began.").



1       Moreover, Roku's primary source of revenue is "platform revenue," which it generates

2   from two sources: (1) revenue sharing agreements with content providers that have content on the

3   Roku OS platform, such as Netflix and Hulu, and (2) advertising revenue from delivering targeted

4   advertising to users on the Roku platform, in part, by using consumer data collected through the

5   use of TCL Roku TVs.[9] While Roku generates some revenue by licensing the Roku platform to

6   TV manufacturers, Roku mainly takes a loss on these licensing deals in order to grow Roku users

7   and make more on platform revenue.[10]

8       To that end, ███████████████████████████████████████

9   ███████████████████████.[11] In exchange, ███████████████████████

10  ████████████████████████████████████████████████████████████

11  ███████████████████████████████    *See* Ex. G to LeGolvan Decl. in Support of Reply

12  ("LeGolvan Decl.") at § 5.7 ██████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████. In fact, the ability to ███████████████████

17

18  [9] *See* https://ir.roku.com/static-files/b76eb397-3636-45b4-86c2-de9669d057a9 (Roku's 2017

19  Form 10-K at p. 12: "[O]ur business model depends on our ability to generate platform revenue
    from content publishers and advertisers. We generate platform revenue from advertising

20  campaigns and on a transactional basis from new subscription purchases and content transactions
    that occur on our platform."); *id.* at p. 6 ("Our advertising products enable advertisers to serve

21  relevant ads to our users and measure return on investment. . . . With Roku TVs, we have the
    ability to use automatic content recognition (ACR) and other technology to collect information

22  about what users watch via antennae and devices connected to Roku TVs, and we collect data
    about the use of the Roku TV's on-screen programming guide.").

23  [10] *See* Chris Welch, *Roku is in the ad business, not the hardware business, says CEO*, THE

24  VERGE, July 20, 2018, https://www.theverge.com/2018/7/20/17595384/roku-ceo-anthony-wood-
    ads-hardware-business-interview-business-model ("But here's something that might surprise you:

25  the money that Roku makes from its hardware lineup isn't enough to sustain the company's
    business. . . . 'We . . . certainly don't make enough money to support our engineering

26  organization and our operations and the cost of money to run the Roku service,' he said. 'That's
    not paid for by the hardware. That's paid for by our ad and content business.'").

27  [11]
    ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████



1

2

3

4

5

6

7   Roku's net platform revenue in 2019 alone, which was over

8   $740 million. Ex. A to Radsch Decl. at p. 57 (Roku's 2019 Form 10-K, noting $740,776,000 in

9   "platform revenue").

10

11

12

13

14

15

16

17   Ex. I to LeGolvan Decl. (2018 CES presentation script) (emphasis added).[13]

18        Thus, the extent of Roku's platform revenue that is attributable to the sale and use of the

19   accused TCL Roku TVs in the underlying action is relevant to the reasonable royalty analysis

20   under several *Georgia-Pacific* factors, including factor 8, which considers "[t]he established

21   profitability of the product made under the patent; its commercial success; and its current

22   _____

[12]

23

24

25

26   [13] Roku also makes similar claims attributing its account growth to its partnerships with TV
     manufacturers in its SEC filings: "We grow new accounts through three primary channels: we sell
27   streaming players, *we partner with TV brands through our Roku TV licensing program*, and we
     have licensing relationships with service operators." *See* https://ir.roku.com/static-files/b76eb397-
28   3636-45b4-86c2-de9669d057a9 (Roku's 2017 Form 10-K at p. 5) (emphasis added).

1 popularity," and factor 10, which considers "[t]he nature of the patented invention; the character

2 of the commercial embodiment of it as owned and produced by the licensor; and the benefits to

3 those who have used the invention." *Georgia-Pacific Corp. v. US Plywood Corp.*, 318 F. Supp.

4 1116, 1120 (S.D.N.Y. 1970) (factor 12: "[t]he portion of the profit or of the selling price that may

5 be customary in the particular business or in comparable businesses to allow for the use of the

6 invention or analogous inventions"). Indeed, TCL's own 30(b)(6) witness testified at his

7 deposition that █████████████████████████████████████████████████.

8 *See* Ex. J to LeGolvan Decl. at 54:8–17 █████████████████████████████████

9 █████████████████████████████████████████████████████ As such,

10 Roku's platform revenue certainly relevant to the reasonable royalty analysis.

11      While Canon has confidence the Court can adequately resolve these relevance issues, they

12 are more appropriately resolved by the issuing court, which already has familiarity with the ████

13 ███████████████████ and will be making ultimate merits determinations on these issues beyond

14 discovery—including in *Daubert* motions, dispositive motions, and trial. Under such

15 circumstances, courts are understandably cautious in resolving such discovery disputes where the

16 issuing court may be in a better position to do so. *Wartsila Tech. Oy Ab v. Hawkins*, No. 18-mc-

17 80001-JCS, 2018 U.S. Dist. LEXIS 7673, at *2–3 (N.D. Cal. Jan. 16, 2018) ("[B]ecause the

18 Subpoena Motion ultimately turns on a question of whether certain information is relevant to the

19 merits of a case pending in the [underlying action], this Court concludes that [the] Motion would

20 be best decided by the court adjudicating that dispute.").[14]

21      **C.  The Risk of Disrupting the Issuing Court's Case Schedule Warrants Transfer to**
22               **the Issuing Court**

23

24 ─────────────────
[14] *See also See Agincourt Gaming, LLC v. Zynga, Inc.*, No. 2:14-cv-0708, 2014 U.S. Dist. LEXIS

25 114348, at *17 n.8 (D. Nev. Aug. 15, 2014) (citing *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*,
813 F.2d 1207, 1211–12 (Fed. Cir. 1987) ("[a] district court whose only connection with a case is

26 supervision of discovery ancillary to an action in another district should be especially hesitant to
pass judgment on what constitutes relevant evidence thereunder")); *Cont'l Auto. Sys., U.S. v.*

27 *Omron Auto. Elecs., Inc.*, No. 14 C 3731, 2014 U.S. Dist. LEXIS 84080, at *6–7 (N.D. Ill. June
20, 2014) (district courts should be hesitant to "[d]elve into the merits" of a relevance

28 determination that "lies at the heart" of the underlying litigation).

1    Roku does not dispute that its motions could impact the issuing court's case deadlines.

2    Instead, Roku accuses Canon of delays and refusing to force its witnesses to travel from Japan in

3    light of the pandemic ███████████████████████████████████████████████████

4    Roku's Opp. at 8–9. Canon has not delayed in reviewing Roku's source code.[15] Further, while

5    two of Canon's code experts have reluctantly agreed to face the risk of in-person review in view

6    of the urgent case schedule, Canon's *testifying* code expert (who will prepare and sign the expert

7    report) has refused to perform in-person review because his age and hypertension put him at high

8    risk for illness. His review of Roku's code is crucial to Canon's case, and it should be done by

9    remote means absent another solution or until the risk for infection lessens. Moreover, the Roku

10   financials at issue here are critical to and holding up Canon's damages expert analysis. Thus,

11   resolution of both motions could impact the issuing court's schedule.

12        **D.  Roku Fails to Articulate Any Relevant Burden**

13        The burden inquiry under Rule 45(f) addresses the burden (if any) on the subpoenaed

14   party by reason of transfer. The burden inquiry is not the potential burden in having to comply

15   with the subpoena, Roku Opp. at 10 (arguing burden of producing source code and financial

16   records), as this issue goes to the merits of the motions to quash. Nor is the burden inquiry an

17   opportunity to relitigate venue rulings from the underlying action, *id.* 1–2, 10 (arguing the

18   purported inequity of venue in the issuing court), as these issues have no bearing on Rule 45.

19   And, finally, the burden inquiry does not focus on some nebulous standard of whether the

20   compliance court's locality has an interest in the underlying action, the parties, or the discovery

21   dispute, *id.* at 4 (arguing the motions "implicate local interests that should be resolved by an

22   NDCA court").

23

24

25

26   [15] As explained in briefing to the issuing court on Canon's motion for remote review, Canon
     diligently attempted in-person review several times as the pandemic grew, only to be faced with

27   Roku's multiple deficient source code productions, shifting sands on state travel restrictions, and
     health concerns raised by Canon's experts. *See* Canon's Mot. to Modify the Protective Order (Ex.

28   A to LeGolvan Decl., Dkt. No. 7-1) at p. 2–5.

1          Instead, the inquiry is whether any alleged burden (if any) to Roku in having its motions

2    resolved by the issuing court outweighs the case-specific circumstances warranting transfer.[16]

3    Here, it does not, as Roku will suffer no burden by reason of transfer. Roku is currently trying to

4    invalidate Canon's patents through IPR petitions (in Virginia), and ████████████████

5    ████████████████████████████████████████████████. Thus, Roku will

6    suffer no new burden due to transfer.[17]

7    **III.    CONCLUSION**

8          Canon respectfully requests that the Court transfer Roku's motions to the issuing court.

9

10   DATED:  May 13, 2020                YAR R. CHAIKOVSKY
                                        ANDY LEGOLVAN

11                                           PAUL HASTINGS LLP

12

13                                   By:  /s/  *Yar R. Chaikovsky*

14                                           YAR R. CHAIKOVSKY

15                                   Attorneys for Plaintiff
                                      CANON, INC.

16

17

18

19

20

21

22   [16] *Moon Mt. Farms, LLC v. Rural Cmty. Ins. Co.*, 301 F.R.D. 426, 430 (N.D. Cal. 2014)

23   (analyzing "the *burden of a transfer* on Wells Fargo" and concluding that "[a]ny burden on Wells Fargo is outweighed by the importance of ensuring consistency in rulings on the issues involved,

24   preserving judicial economy, and permitting the court with the most experience and knowledge of the facts to rule on these matters") (emphasis added).

25   [17] ████████████████████████████████████████████████

26   ████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ████████████████████████████████████████████████